

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-13-00388-CV

IN THE INTEREST OF B.D.M. AND
S.P.M., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant J.M. (Father) appeals the trial court's judgment terminating his

parental rights to his two children, B.D.M. (Brandon) and S.P.M (Sam).[2]  In one

issue, Father argues that the evidence is legally and factually insufficient to

---

[1]*See* Tex. R. App. P. 47.4.

[2]Except for employees of the Department of Family and Protective Services (the Department), we use aliases to protect the identities of the individuals involved in this case.  *See* Tex. R. App. P. 9.8(b)(2).

support the trial court's finding that termination of his parental rights is in the children's best interest.[3] We affirm.

## I. Background

In February 2010, the Department received a report alleging that Father and K.L. (Mother) were neglecting Brandon and Sam. At that time, Brandon was three years old, and Sam was two. The Department's subsequent investigation found that the children were living in an apartment with D.L., mother's mother (Grandmother). The children were very dirty and had to be wiped clean so the investigator could examine them for signs of physical abuse. The investigation further revealed that the water to the residence had been cut off and the residence was unsanitary, with rotten food, dirty clothing, dirty dishes, and trash strewn about. The residence also had numerous safety hazards, including prescription medication bottles within the reach of the children and the use of a heater with exposed coils and an open oven to heat the residence. At the time of the investigation, Mother and Father were visiting Grandmother and the children for a few days. Mother tested positive for opiates and amphetamines. Father refused to take a drug test.

To avoid removal of the children by the Department, Grandmother and Mother signed a safety plan in which they agreed that Grandmother would be the

---

[3]Father does not challenge the sufficiency of the evidence to support the trial court's findings under family code section 161.001(1). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N) (West 2014). Therefore, we do not address them. *See* Tex. R. App. P. 47.1.

children's caretaker and that they would reside with her in the home of a relative until Grandmother could find a clean, safe residence for herself, Brandon, and Sam. Grandmother and Mother also agreed Brandon and Sam would not be left alone with Mother or Father.

In March 2010, Grandmother and the children were living in a motel. During a visit to their motel room, the Department found that Grandmother had left the children with Mother and Father while she was at work. The room was unsanitary and was littered with trash, old food, and dirty clothing. The room also had numerous safety hazards, including knives and a lighter within the children's reach. The children had rashes covering their bodies and appeared to have lice. As a result, the Department removed the children from the home.

Joanna Letz, the Department caseworker assigned to the case, testified that she provided Father with a service plan, but Father failed to complete any of its requirements. Letz also testified that Father was incarcerated for the fourteen months she was assigned to the case. On several occasions, Mother told Letz she was afraid of Father and did not want to be around him or have any communication with him because he had physically abused her. Mother also reported to Letz that Father threatened to do whatever it took to get Brandon away from her when Father was released from jail, even if it meant killing Mother.[4]

---

[4]At that time, Father was not sure that Sam was his child.

In December 2011, the trial court entered a final order naming Mother as the children's primary managing conservator and ordering that Father have no unsupervised contact with the children. Father was awarded supervised visitation with the children through family court services.

In July 2012, the Department received a report alleging neglectful supervision of the children and methamphetamine use by Mother. The Department made several attempts to locate Mother and the children between July and September 2012, but the Department could not find them. In early October 2012, the Department located Mother and the children living in a motel room. Despite the December 2011 final order prohibiting Father from having contact with the children outside of family court services, Father was found to be living in the motel room with Mother, Grandmother, and the children. Mother was found to have an outstanding warrant and was arrested. Grandmother could not care for the children during the day due to her job, and she was unable to find another caregiver for the children. As a result, the children were removed from Mother and Father again in October 2012. Brandon was six years old at the time, and Sam was four. Elira Sulejmani, the Department caseworker assigned to the case, testified that when the children came into the Department's care for the second time, Brandon was not enrolled in school even though he was old enough and both children were soiling themselves and had anger-management issues.

In September 2013, Mother executed an affidavit relinquishing her parental rights to Brandon and Sam. The final trial on the Department's petition seeking to terminate Mother's and Father's parental rights commenced in October 2013. Sulejmani testified that when she spoke with Father shortly after the children were removed, Father said he was without a permanent residence but was willing to work services. Sulejmani further testified that she prepared a service plan and gave it to Father. The service plan required Father to obtain employment and housing, stay sober and drug free, attend scheduled visits with the children, maintain contact with Sulejmani, complete a substance abuse assessment, and attend an anger management program, individual counseling, and a parenting education class. Sulejmani spoke with Father again in late October 2012. At that time, Father said he did not have a place of residence or a telephone number.

When Sulejmani met with Mother in late October 2012, she informed Sulejmani that she and Father became involved as teenagers and had been together on and off for approximately ten years. Mother reported to Sulejmani that there had been domestic violence between Mother and Father in the past from time to time, but there was no domestic violence between them at the present. In late January 2013, however, Father attempted to suffocate Mother. Father was convicted of assault causing bodily injury to a family member and was incarcerated in the Tarrant County jail from late January through mid-March 2013.

5

In late May 2013, Father was arrested for delivery of methamphetamine. He pled guilty, and in late August 2013, he was sentenced to one year's confinement and was credited with approximately three months of jail time. At the time of the termination trial, Father was incarcerated in a state jail facility and was not due to be released until late May 2014.

Father testified that he has been incarcerated on and off since he was a kid and that he was convicted of marijuana possession in Erath County in 2006. The Department offered evidence of Father's convictions in Tarrant County since 2007, the year after Brandon was born. In August 2007, Father pled guilty and was sentenced to ten days in jail for possession of a prohibited weapon. Shortly thereafter, in September 2007, Father pled guilty and was placed on probation for unauthorized use of a vehicle and for evading arrest or detention using a vehicle. In December 2007, Father pled guilty and was sentenced to thirty days in jail for burglary of a vehicle. As a result of this conviction, Father's probation was revoked, and he was sentenced to fifteen months in a state jail facility. In August 2010, Father pled guilty and was sentenced to two years' imprisonment for theft of a vehicle. In addition, Father testified about a state jail felony conviction in Dallas County for burglary of a building.

Sulejmani opined that because of this continuing pattern of criminal activity and Father's history of family violence with Mother, Father failed to demonstrate that he could protect the children from physical and emotional danger now or in the future. According to Sulejmani, Father's ongoing pattern created the danger

6

that Brandon and Sam might be exposed to criminal activity or family violence in the future.

Sulejmani further opined that Father did not demonstrate that he could meet the emotional and physical needs of Brandon and Sam now or in the future because of the inconsistency of his visits, his housing instability, and his failure to complete any of the requirements set forth in the service plan. Sulejmani testified that excluding the time periods during which Father was incarcerated during the pendency of this case, he could have attended fourteen visits with Brandon and Sam. Father only attended two of these visits. Sulejmani stated that Father's lack of attendance concerned her because Father could not establish or maintain a bond with Brandon and Sam in only two visits. Sulejmani was further concerned because during these two visits, Father did not engage with Brandon and Sam. He did not play with the children or ask them how they were doing, and Sulejmani had to ask Father to initiate conversation with Brandon and Sam.

According to Sulejmani, Father also failed to demonstrate that he could provide his children with a safe, stable place to live because throughout the case, Father did not have a permanent residence. Sulejmani testified that she was only able to obtain the address for one of Father's residences, and when she made an unannounced home visit, the home was in deplorable condition and unlivable. There was cardboard on the windows, glass on the floor, the ceiling

was caving in, and there were sheets covering the doorways because the doors were missing.

Sulejmani further testified that Father failed to complete any of the requirements set forth in the service plan. According to Sulejmani, the counseling required by the service plan was available to Father while he was incarcerated in the Tarrant County jail. Sulejmani further stated that under the service plan, Father was expected to have monthly contact with her. In the intervening months between his release from jail for the assault on Mother and his incarceration for delivery of methamphetamine, he never contacted Sulejmani or visited her at her office. Sulejmani testified that she worked with Father in an attempt to reunify him with the children. She spoke with Father on the phone, had him come to her office for monthly office visits, and visited with Father while he was in jail and in the state jail facility.

Sulejmani further stated that since their removal, the children are no longer soiling themselves, and their anger-management issues have improved greatly. Both are doing well emotionally and physically and are doing well in their foster home and at school. Sulejmani testified that if Mother's and Father's rights were terminated, the Department's permanency plan for Brandon and Sam was adoption by a family that had adopted their younger brother G.M. (Gregory).[5] As

---

[5]It appears from the record that Mother gave birth to Gregory while Brandon and Sam were in the Department's care for the first time and that she gave Gregory up for adoption at birth. The record also indicates that Brandon

8

of the time of trial, Brandon and Sam had weekly visits with their prospective adoptive parents, and the Department was in the process of moving the children to their home for foster care. Sulejmani testified that she believed termination of Father's parental rights was in the children's best interest because the children would then be able to be adopted by a family that would be able to meet their emotional, physical, and medical needs, that would be able to protect them and keep them safe, and that would show them what it feels like to be loved and wanted by parents, as well as be in the same family as Gregory.

Father stated that he did not want his parental rights terminated, but he acknowledged that he was not in a position to take Brandon and Sam home with him because he was incarcerated. Father testified that he and Sulejmani discussed a service plan, but he claimed he never received his plan from the Department. Father's understanding was that the plan required him to complete one class and obtain a permanent address and employment. Father stated he had not completed any of these requirements because he was incarcerated.

Father claimed that he expected to be released as early as March 14, 2014, and no later than May 22, 2014. Father testified that he had secured employment with an electric company after his release. According to Father, his future employer wrote to him in prison to offer him a job and promised to train

---

and Sam have an older brother, D.M. (Daniel), who was born in 2004. Mother and Father relinquished their parental rights to Daniel.

9

Father and to provide him with a place to live and a company vehicle. Father planned to save money for a house in the country and a vehicle of his own.

Father admitted that he has not had an opportunity to be a part of his children's lives because he has been in and out of jail. He claimed to have learned from these experiences and to have changed, and he wanted the court to give him another chance to be a father. He planned to provide Brandon and Sam with everything a father should, specifically education and medical care. Father stated he has been attending church and considers himself a changed man. Father testified he wants to provide Brandon and Sam with a better life and see them graduate from school, which he did not have a chance to do. He asked the court for the opportunity to better himself so that in the future, he will be able to care for his children.

Father further agreed he would not contact Mother or allow her to see Brandon and Sam. Father stated he did not plan to have a relationship with Mother because she failed to take care of the children while he was incarcerated and she relinquished her rights to the children. Father also believed that Mother had been using drugs during the case and needed treatment.

At the conclusion of the trial, the court found that Father had (1) knowingly placed or knowingly allowed Brandon and Sam to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed Brandon and Sam with persons who engaged in conduct that endangered their physical or emotional well-being; and (3)

10

constructively abandoned the children who had been in the permanent or temporary managing conservatorship of the Department or an authorized agency for not less than six months and (a) the Department or authorized agency made reasonable efforts to return the children to Father; (b) Father did not regularly visit or maintain significant contact with the children; and (c) Father demonstrated an inability to provide the children with a safe environment. Based upon these findings and a finding that termination of Father's parental rights was in the children's best interest, the trial court terminated Father's parental rights.[6]

## II. Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

---

[6]The trial court also terminated Mother's parental rights. Mother is not a party to this appeal.

11

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could

12

reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable

13

factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### III. Best Interest of the Children

Father argues in his sole issue that the evidence is legally and factually insufficient to support the trial court's finding that the termination of his parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2) (requiring clear and convincing evidence "that termination is in the best interest of the child").

### A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *E.N.C.*, 384 S.W.3d at 807; *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors").

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

15

**B. Discussion**

Father contends that the evidence is legally and factually insufficient to support the trial court's best-interest finding because there was no evidence of Brandon's and Sam's desires or that Brandon and Sam were ever physically or emotionally harmed while in Father's presence. Father relies on his testimony that he has secured employment, housing, and transportation after his release; is attending church; wants to see the children attend school and graduate; and was unable to complete the service plan because he was incarcerated for most of the case and is currently incarcerated. He also complains that the Department did not attempt to set up services for him while he was incarcerated.

While there is no direct evidence concerning the desires of Brandon, who was seven years old at the time of trial, and Sam, who was five, the trial court considered the report of the Court Appointed Special Advocate assigned to the case, which stated that Sam asked the advocate "for things for his father in the hope that he will be reunited with him." Even with this evidence, the *Holley* factors weigh heavily in favor of termination.

Father has an ongoing pattern of criminal activity. Father stated that he has been incarcerated on and off since he was a kid. Father's criminal activity continued even after Brandon and Sam were born, and his extensive criminal history includes convictions for marijuana possession, delivery of methamphetamine, evading arrest, burglary of a building, and domestic violence; he also had a history of assaulting Mother. *See In re V.V.,* 349 S.W.3d 548, 558

16

(Tex. App.—Houston [1st Dist.] 2010, pet. denied) (op. on reh'g) (holding that parent's extensive criminal record also reflects on best interest of children in maintaining relationship with that parent); *In re R.R.*, 294 S.W.3d 213, 235 (Tex. App.—Fort Worth 2009, no pet.) (holding that exposure to domestic violence is relevant when considering child's best interest). Moreover, Father was incarcerated twice after the children were removed for a second time in October 2012. *See In re A.I.T-A.*, No. 02-13-00164-CV, 2013 WL 5967029, at *11 (Tex. App.—Fort Worth Nov. 7, 2013, no pet.) (mem. op.) (stating that parents' incarceration and drug use after removal provide an indication of the emotional and physical danger to the children while in their parents' care).

Father testified that he has plans for the children after his release and that he has secured housing, employment, and transportation, but he provided no specific plans for Brandon's and Sam's care. "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.— Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.). Father testified that he had secured employment with an electric company after his release and the position included housing and a company vehicle. This evidence is favorable to Father, but it reveals, at best, only a recent improvement in his potential ability to provide for the children. Even accepting this testimony as true, recent improvement alone is not sufficient to avoid termination of parental rights. *In re K.D.C.*, No. 02-12-00092-CV, 2013 WL 5781474, at *16 (Tex. App.—Fort Worth

17

Oct. 24, 2013, no pet.) (mem. op.); *see also In re J.O.A.*, 283 S.W.3d 336, 346–47 (Tex. 2009) (providing that even significant evidence of improved conduct, especially in short duration, does not conclusively negate the probative value of a history of irresponsible choices); *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (providing that evidence of a recent turnaround should be determinative only if it is reasonable to conclude that the positive improvements will surely continue).

Father complains that he was unable to complete the service plan because he was incarcerated and the Department failed to set up services for him while he was incarcerated. The evidence, however, reveals that Father failed to take advantage of the counseling available to him while he was in the Tarrant County jail for assaulting Mother. Moreover, aside from his limited contact with Sulejmani and his two visits with his children, Father failed to initiate the services set forth in the plan during the periods he was not incarcerated. *See In re A.B.*, 269 S.W.3d 120, 129 (Tex. App.—El Paso 2008, no pet.) (noting parent's failure to complete service plan as relevant to best-interest analysis); *In re T.D.L.*, No. 02-05-00250-CV, 2006 WL 302126, at *9 (Tex. App.—Fort Worth Feb. 9, 2006, no pet.) (mem. op.) (noting in best-interest analysis the parent's failure to complete service plan other than attending a few parenting classes). Father demonstrated poor parenting skills during visitations and attended only two of the fourteen possible visitations when he was not incarcerated. *See D.F. v. Tex. Dep't of Family & Protective Servs.*, 393 S.W.3d 821, 834 (Tex. App.—El Paso

18

2012, no pet.) (discussing parent's inconsistent attendance at visitation as relevant to best-interest analysis), *abrogated on other grounds by In re E.C.R.*, 402 S.W.3d 239, 246 (Tex. 2013).

In contrast to Father's history with the children, the evidence reflects that since their removal, Brandon and Sam are doing well emotionally and physically and are doing well in their foster home and at school. The Department's plan for Brandon and Sam is adoption by the family that adopted their younger brother. Sulejmani testified that she believed termination of Father's parental rights was in the children's best interest because they would be able to be adopted by a family that would be able to meet their emotional, physical, and medical needs and that would be able to protect them, keep them safe, and show them what it feels like to be loved and wanted by parents, as well as be in the same family as the children's younger brother.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is such that the factfinder could reasonably form a firm conviction or belief that termination of Father's parental rights is in the children's best interest. *See J.P.B.*, 180 S.W.3d at 573. We also conclude, viewing all the evidence in a neutral light, that the factfinder could reasonably form a firm conviction or belief that termination is in the children's best interest. *See H.R.M.*, 209 S.W.3d at 108. We therefore hold that the evidence supporting the trial court's best-interest finding is legally and factually sufficient to support the judgment, and we overrule Father's sole issue.

19

## IV.  Conclusion

Having overruled Father's sole issue, we affirm the trial court's judgment.

/s/ Anne Gardner

ANNE GARDNER
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED:  April 3, 2014